# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: September 21, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| PATRICIA A. SPAYDE, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 16-1499V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Ruling Awarding Damages; Influenza |
| AND HUMAN SERVICES, | * | ("Flu") Vaccine; Guillain-Barré Syndrome |
| | * | ("GBS"); Pain and Suffering; Life Care |
| Respondent. | * | Plan. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Dan R. Mastromarco, Mastromarco Firm, PLLP, Annapolis, MD, for Petitioner.
Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON DAMAGES[1]

On November 14, 2016, Patricia A. Spayde ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioner alleges that as a result of an influenza ("flu") vaccine administered on November 13, 2013, she suffered from Guillain-Barré Syndrome ("GBS"). Petition at Preamble (ECF No. 1). On January 27, 2021, the undersigned

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

issued a Ruling on Entitlement, finding that Petitioner was entitled to compensation. Ruling on Entitlement dated Jan. 27, 2021 (ECF No. 139).

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs. Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $165,000.00 for actual pain and suffering. This Ruling also awards the costs for certain disputed items in the life care plan.

## I. PROCEDURAL HISTORY

Petitioner filed her petition on November 14, 2016. Petition. The early procedural history from November 2016 through January 2021 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here. See Ruling on Entitlement at 2-3.

Thereafter, the parties engaged in settlement discussions but were not able to resolve this matter informally. Joint Status Report ("Rept."), filed Apr. 20, 2023 (ECF No. 227). During settlement discussions, Petitioner filed various records, including updated medical records, a questionnaire from Dr. Douglas Forsyth, and an expert report from Dr. Damanhuri Alkaitis. Petitioner's Exhibits ("Pet. Exs.") 52-64. The parties agreed to submit the issues of pain and suffering and certain life care plan items to the Court's resolution by briefing. Joint Status Rept. at 2.

On May 31, 2023, Petitioner filed a brief in support of her claim for damages. Pet. Brief in Support of Petitioner's Claim for Damages ("Pet. Br."), filed May 31, 2023 (ECF No. 235). Respondent filed his responsive brief on June 30, 2023. Respondent's Br. on Damages ("Resp. Br."), filed June 30, 2023 (ECF No. 105). Petitioner filed a reply on July 16, 2023. Pet. Reply Br. in Support of Claims for Damages ("Pet. Reply Br."), filed July 16, 2023 (ECF No. 239). An updated consolidated life care plan was filed on August 28, 2023. Resp. Ex. I.

This matter is now ripe for adjudication.

## II. FACTUAL HISTORY

The Ruling on Entitlement issued on January 27, 2021, and it set forth a summary of Petitioner's medical records, affidavits, and hearing testimony. See Ruling on Entitlement at 3-15. Further, the parties have set forth summaries of relevant facts which support their respective positions in their briefs, which the undersigned has reviewed as well as all of the medical records and evidence filed in this matter.

A brief summary of some facts relevant to this Ruling follows. While all the records are important, these entries provide specific information about Petitioner's condition important to the undersigned's Ruling.

At the time of her vaccination, Petitioner was 68 years old, and while she did have a history of diabetes, she did not have any specific physical limitations noted in her medical records.  See Pet. Ex. 2 at 1-6.  Petitioner's pre-vaccination medical records showed Petitioner was a retired group home provider who enjoyed gardening and canning and spent her winters in Florida.  Id. at 77.  Pre-vaccination, Petitioner was able to perform all of the activities of daily living.  See Pet. Exs. 3, 9.  She was able to drive without any limitations, she cooked, and she completed her own housework, yardwork, lawncare, gardening, and canning.  See Pet. Ex. 3 at ¶ 12; Pet. Ex. 9 at ¶ 6.  Petitioner also enjoyed activities with her grandchildren, including walking and other activities, as well as travelling and canning.  See Pet. Ex. 3 at ¶ 11; Pet. Ex. 9 at ¶ 7.

Petitioner received the flu vaccination at issue on November 13, 2013.  Pet. Ex. 2 at 6.  Subsequently, she developed numbness in her hands, pain, and extreme weakness, and she presented to the emergency room ("ER") and was admitted on January 24, 2014.  Id. at 18, 33, 38, 46.  Petitioner underwent a neurological consultation with Dr. Barbara A. Jahnke.  Id. at 76.  Dr. Jahnke documented Petitioner "[was] able to get to the edge of the bed, stand independently, . . . [and] stand on her toes, but ha[d] difficulty standing and raising her heels."  Id. at 78.  Physical examination revealed absent deep tendon reflexes throughout.  Id.  Dr. Jahnke also noted Petitioner's left foot was weaker than her right.  Id.  Following an electromyography ("EMG")/ nerve conduction study ("NCS") and lumbar puncture, Petitioner was diagnosed with GBS.  Id. at 105-06.  A case management note dated January 24, 2014 indicated that Dr. Forsyth reported that Petitioner was able to ambulate to the bathroom independently and able to feed herself.  Id. at 75.  Dr. Jahnke also noted that Petitioner was seen by physical therapy that day.  Id. at 76.

While hospitalized, Petitioner complained of back pain, pain in abdomen, and pain from her shoulders to her hips, rated 7/10 and 9/10, at different times, which required the narcotic dilaudid.  Pet. Ex. 2 at 123, 128-31.  She also had significant anemia (hemoglobin of 7.9) due to plasmapheresis treatment for her GBS.  Id. at 133, 135-36.  She also received intravenous immunoglobulin ("IVIG") infusions.  Id. at 133.

Petitioner was discharged home on February 8, 2014 after being hospitalized for 15 days.  Pet. Ex. 2 at 138.  After discharge, she did not receive outpatient physical therapy, but she did receive strengthening activities from her neighbor, a retired occupational therapist.  Pet. Ex. 3 at ¶ 9.

On March 5, 2014, Petitioner saw Dr. Forsyth for follow-up.  Pet. Ex. 2 at 149.  At that visit, she complained of left foot pain.  Id.  Her gait was documented as being normal.  Id. at 152.  She requested to stop her Neurontin for nerve pain.  Id.

Petitioner saw her neurologist, Dr. Janhke, for a follow-up examination on July 28, 2014.  Pet. Ex. 28 at 153.  Dr. Janke noted remarkable improvement in strength and endurance, and activities of daily living, despite having surgery for a liposarcoma in April 2014.  Id.

Although Petitioner had a good recovery, her GBS has left residual effects.  Registered nurse ("RN"), Bridget Young performed an assessment on February 8, 2017.  Pet. Ex. 9 at ¶ 2.  She documented that Petitioner required assistance with cooking, housework, writing, walking,

3

gardening, and lawn care.  Id. at ¶ 6.  Nurse Young also documented Petitioner was unable to travel, enjoy activities that she once enjoyed with her grandchildren, can, sew, or camp.  Id. at ¶ 7.

Dr. Forsyth submitted a letter, dated June 11, 2022, that was based on an evaluation he conducted on May 28, 2022.  Pet. Ex. 57 at 1.  The letter addressed Petitioner's GBS and the sequelae that it has left.  See id.  He opined that Petitioner "still suffers from mostly left-sided weakness," neuropathic discomfort, and pain in her hands and feet, more on the left side than the right.  Id.  Her weakness and discomfort worsen with fatigue.  Id.  Petitioner no longer takes Neurontin.  Id.  Current limitations include left-sided weakness, incoordination, and fatigue.  Id.  She has difficulty going up and down stairs and is unsteady on step stools.  Id.  Dr. Forsyth noted that Petitioner was "functioning relatively well," and he noted that she is not a complainer.  Id.

### III.   PARTIES' CONTENTIONS

#### A.   Pain and Suffering

##### 1.   Petitioner's Contentions

Petitioner requests a pain and suffering award of $180,000.00.  Pet. Br. at 40.  For support, Petitioner cites to the facts of this case as well as prior Vaccine Program cases.  Id. at 14-40; Pet. Reply at 13-20.  Petitioner states that she "do[es] not see a distinction between the rulings that results in awards between $165,000 and $180,000 and [Petitioner's] fact pattern."  Pet. Br. at 38.  And thus, Petitioner contends she should be awarded a pain and suffering award of $180,000.00.  Id. at 40.

Petitioner contends her GBS has "unquestionably reduced [her] quality of life."  Pet. Br. at 37.  Petitioner has been unable to do activities from which she previously derived pleasure, such as feeding birds, gardening, and canning.  Id. at 17, 37.  Petitioner notes that her issues "are compounded because she effectively lives alone and feels as if she can no longer take care of her husband as she has in the past."  Id.

Additionally, Petitioner argues she has undergone an "exceedingly long duration of suffering."  Pet. Br. at 37.  Petitioner details her pain and suffering that began during the holiday season in 2013 and continues today.  Id. at 14, 37; Pet. Reply at 13-18.  She continues to have numbness, tingling, instability, generalized fatigue, as well as "constant, 24/7 real pain manifesting itself in way that cannot be treated."  Pet. Br. at 14, 37.  Petitioner acknowledges her case of GBS is "perhaps not severe," but argues it "is at least moderate."  Id. at 37; see also Pet. Reply at 13-15.  And both Dr. Forsyth and Dr. Alkaitis have opined that Petitioner will continue to suffer from the residual effects of her GBS for the remainder of her life.  Pet. Br. at 38; Pet. Reply at 16.

Petitioner cites to a recent letter from her treating physician, Dr. Forsyth, dated June 11, 2022, that indicated "[Petitioner] still suffers from mostly left-sided weakness," with "[n]europathic discomfort and pain" in her hands and feet that worsens with fatigue."  Pet. Br. at 15 (quoting Pet. Ex. 57 at 1).  Dr. Forsyth "expect[s]" Petitioner's left-side weakness to worsen

over time leading to "more difficulty ambulating" and other associated issues. Id. (quoting Pet. Ex. 57 at 2). He opines Petitioner's GBS is "as well as it is ever going to get" and "her condition will only deteriorate over time." Id. at 15-16 (quoting Pet. Ex. 57 at 2). Dr. Forsyth also notes Petitioner does not tend to complain, and Petitioner argues that the fact that there is a record of complaints from Petitioner should be taken into account when gaging the severity of her award. Id. at 38.

Petitioner's expert, Dr. Alkaitis, also provided an expert report in October 2022 opining that Petitioner currently suffers from the sequelae of GBS and her "illness will likely be permanent." Pet. Br. at 16-17 (citing Pet. Ex. 64 at 4-5). He finds the medical records show Petitioner "continues to have tingling in her feet and hands particularly on her left side," difficulty with gait, and "mild generalized weakness." Id. at 16 (quoting Pet. Ex. 64 at 4). Dr. Alkaitis also opines Petitioner's symptoms are "persistent and have continued for eight years following diagnosis of GBS," and such "permanency of the sequelae are consistent with the literature." Id. at 17 (quoting Pet. Ex. 64 at 5).

Next, Petitioner provides a detailed examination of prior cases in the Vaccine Program with comparable pain and suffering awards.[3] See Pet. Br. at 20-36; Pet. Reply at 18-20. Comparing some of the past awards, Petitioner notes that the average award for pain and suffering in a GBS case is $167,013.92. Pet. Br. at 22.

Petitioner discusses Castellanos, a case in which Respondent relies upon. Pet. Br. at 22-24 (citing Castellanos v. Sec'y of Health & Hum. Servs., No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022)); Pet. Reply at 10-13. The Castellanos petitioner was awarded $125,000.00 in pain and suffering. Castellanos, 2022 WL 1482497, at *10. The special master in Castellanos found the petitioner continued to suffer numbness in hands and feet; however, it was "difficult to disentangle what may be [p]etitioner's lingering GBS symptoms from his comorbidities." Id. at *9. Additionally, the treating physicians in Castellanos recorded his GBS as "stable" and did not directly attribute his ongoing symptoms to his vaccine injury. Id.

Petitioner argues Castellanos is not comparable. Pet. Br. at 23-24, 39-40; Pet. Reply at 10-13. Petitioner notes there is evidence in this case to support a finding that Petitioner's continued symptoms are due to her GBS, not due to other comorbidities like in Castellanos. Pet. Br. at 23, 23 n.30, 39; Pet. Reply at 12. Petitioner stresses "[t]he permanency of [her] injury is a point of severe departure when comparing her facts to Castellanos." Pet. Br. at 39; see also Pet. Reply at 11. Petitioner noted her treating physicians opined her GBS is "permanent," while the treating physicians in Castellanos did not make such a finding. Pet. Br. at 24, 39-40.

Petitioner also cites to Gross for support. Pet. Br. at 26-27 (citing Gross v. Sec'y of Health & Hum. Servs., No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021)). The petitioner in Gross was awarded $160,000.00 in pain and suffering. Id. at 26. Petitioner argues the Gross petitioner "tended to exaggerate her symptoms," while Petitioner here "tends to

---

[3] The undersigned discusses only those cases she finds most relevant for the sake of brevity.

'minimize' symptoms." Id. at 26-27; see also Pet. Reply at 16-17. And "[d]espite the award in Gross, there was no specific discussion of the permanency of Ms. Gross' sequalae, and the implication was that the GBS had diminished." Pet. Br. at 26.

In Johnson, another case Petitioner cites for support, $180,000.00 was awarded for pain and suffering after the petitioner underwent a five-day hospitalization for GBS with IVIG treatment and experienced residual symptoms for two-and-one-half years that "totally changed [her] life." Pet. Br. at 32-34 (quoting Johnson v. Sec'y of Health & Hum. Servs., No. 16-1356V, 2018 WL 5024012, at *8 (Fed. Cl. Spec. Mstr. July 20, 2018)). Petitioner argues she, like the Johnson petitioner, downplayed complaints and continued to have residual symptoms that were noted to show no evidence of future improvements. Pet. Reply at 18-19. However, Petitioner underwent a longer hospitalization. Id. at 18.

Similarly, the petitioner in Presley was awarded $180,000.00 for pain and suffering after the special master found the severity and duration of pain and suffering was similar to that suffered in Johnson. Pet. Br. at 34-35 (citing Presley v. Sec'y of Health & Hum. Servs., No. 17-1888V, 2020 WL 1898856, at *10-13 (Fed. Cl. Spec. Mstr. Mar. 23, 2020)). Petitioner here, like the petitioner in Presley, suffers from Type II diabetes mellitus; however, unlike the Presley petitioner, Petitioner "was hospitalized four times longer" and continues to suffer from residual sequalae. Pet. Reply at 19. Additionally, the special master in Presley took into consideration the fact that he lived alone, and Petitioner here lives in a farming community with her disabled husband. Id. at 19-20.

### 2.   Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $125,000.00 for pain and suffering. Resp. Br. at 23. Respondent does not dispute awareness of injury. Id.

First, Respondent explains why $125,000.00 in pain and suffering is appropriate considering Petitioner's severity and duration of her injury. Resp. Br. at 23-24. Respondent notes "Petitioner's clinical course involve[s] a seventeen-day hospitalization . . . with no inpatient or outpatient rehabilitation" after being discharged home. Id. at 23. During her hospitalization, she developed "cellulitis of the foot and received management for hypokalemia and [diabetes mellitus]" and "[s]he received five infusions of plasmapheresis and IVIG." Id. Following discharge, she improved, and within six months, "[P]etitioner's neurologist felt that she had made remarkable improvement in strength, endurance, and [activities of daily living]." Id.

Respondent notes Petitioner has "continued to improve over time, although she continue[s] to describe numbness and tingling in her left toes and weakness in her left hand." Resp. Br. at 24. Post-vaccination records from 2020 and 2022 show "[P]etitioner exercised daily and could perform [activities of daily living] without assistance, including driving, shopping, meal preparation, housework, and doing laundry." Id. And in May 2022, Dr. Forsyth noted "[P]etitioner was not on any medication to treat GBS residuals, she did not see a physical

6

therapist, and that her sequelae included left-sided weakness and neuropathic pain." Id. (citing Pet. Ex. 57 at 1).

Respondent argues that some of Petitioner's continued symptoms are due to other underlying issues, not her GBS. Resp. Br. at 24. Respondent maintains Petitioner's carpal tunnel syndrome ("CTS"), shown on EMGs in 2017 and 2022, is "unrelated" to her GBS and those EMGs show "no evidence of ongoing GBS residuals." Id. Additionally, Respondent cites to "some evidence that some of [P]etitioner's ongoing sequela may be related to her poorly-controlled [diabetes mellitus]." Id.

Next, Respondent describes why an award of $125,000.00 in pain and suffering is consistent with prior cases. Resp. Br. at 24-25. Respondent finds Petitioner's case directly analogous to Castellanos. Id. (citing Castellanos, 2022 WL 1482497). The Castellanos petitioner was a retiree with a pre-vaccination history of diabetes mellitus; was hospitalized for nine days and received five days of IVIG, physical therapy, and occupational therapy; went to inpatient rehabilitation for 30 days; and used a walker for several weeks after discharge but was able to walk without assistance five months later. Id. at 24 (citing Castellanos, 2022 WL 1482497, at *9). Additionally, when the petitioner in Castellanos reported numbness in his hands and feet later that year, his treating physicians attributed it to other conditions, including diabetes mellitus, and he was later diagnosed with CTS. Id. at 24-25 (citing Castellanos, 2022 WL 1482497, at *9). Respondent described that the special master in Castellanos "stated that 'it [became] difficult to disentangle what may be Petitioner's lingering GBS symptoms from his comorbidities,' and although he described Mr. Castellanos' GBS as moderate, he stated that it 'occurred in the shadow' of a '"stew" of comorbidities,' including diabetic peripheral angiopathy, bilateral ankle weakness, and CTS." Id. at 25 (quoting Castellanos, 2022 WL 1482497, at *9-10). Thus, weight was given to the possibility that the comorbidities explained some symptoms, and the petitioner in Castellanos was awarded $125,000.00 in pain and suffering. Id.

Although Petitioner's hospitalization was longer than in Castellanos and she received plasmapheresis and IVIG, Petitioner did not receive inpatient rehabilitation or physical therapy, nor did she use assistive devices after discharge. Resp. Br. at 25. Both Petitioner and the petitioner in Castellanos had a pre-existing history of diabetes mellitus and were later diagnosed with CTS, which Respondent argues "partially explain[s] some of their ongoing sequalae." Id. Respondent also argues Petitioner's "mild ongoing sequelae from her GBS" is "challenging to separate from the 'stew' of other comorbidities, including uncontrolled [diabetes mellitus] and CTS." Id. Therefore, Respondent maintains $125,000.00 is a reasonable and adequate award of pain and suffering in this case. Id.

Lastly, Respondent argues Petitioner's proposed pain and suffering award of $180,000.00 is not supported by prior cases.[4] Resp. Br. 26-27. Johnson and Presley, for example, are not analogous to this case because unlike those petitioners,[5] Petitioner here had no post-discharge

---

[4] Again, the undersigned discusses only those she finds most relevant.

[5] See Resp. Br. at 26.

7

inpatient or outpatient treatment; "[s]he recovered well on her own[] and within six months of discharge;" she "made remarkable improvement in strength, endurance, and [activities of daily living];" and she "exercised daily and could perform [activities of daily living] without assistance by June 2020." Id. at 27. Thus, Respondent contends Petitioner's clinical course was not as significant as in Johnson and Presley. Id.

Respondent concludes that "[g]iven the relatively straightforward recovery of [P]etitioner in this case (with minor ongoing sequelae), it would be inappropriate for the Court to award a comparable award for pain and suffering as what was awarded to the [P]etitioners in the above cases." Resp. Br. at 27. Therefore, considering all relevant factors, Respondent's proposed award of $125,000.00 for pain and suffering is reasonable and appropriate. Id.

### B. Life Care Plan

#### 1. Home Care

The first item of the life care plan that remains in dispute deals with home care. Resp. Ex. I at 1. Petitioner contends this item includes aides or tools for personal hygiene, required laundry services, and assistance to meet nutritional needs. Pet. Br. at 5; Pet. Ex. 65 at 3. Respondent agrees this item is "reasonably necessary," but disagrees as to the amount requested by Petitioner. Resp. Br. at 18. Petitioner requests $20,149.00 per year for 15 hours per week for life, while Respondent argues eight hours per week or $10,745.28 per year for life is appropriate. Resp. Ex. I at 1. The parties differ on the hours needed, rather than the hourly wage for the costs of these services. Pet. Br. at 6.

Petitioner contends eight hours per week is "inadequate" for "the tasks that would be required for hygiene, cooking, and home maintenance, even if laundry were excluded from the calculus." Pet. Br. at 7. Petitioner indicates her estimate is closer to 30 hours, but "in the interest of resolving this matter, Petitioner is willing to accept services for 15 hours each week." Id. at 7-8. For support, Petitioner cites to records from her treating physicians, her expert Dr. Alkaitis, and her life care planner. Id. at 7; Pet. Reply Br. at 2-4. Petitioner argues "Respondent overstates the success of Petitioner's recovery" and "her capacity to perform [activities of daily living]." Pet. Reply Br. at 2.

Respondent contends "eight hours per week to assist with care needs, including personal care, laundry, light housework, and cooking . . . is generous" given the fact that Respondent has agreed to pay to move Petitioner's laundry and modify her bathroom to include a walk-in tub, which Respondent argues "greatly reduces the need for a home care provider to assist with laundry and personal care." Resp. Br. at 20. Respondent adds that Dr. Forsyth indicated Petitioner can "perform [activities of daily living] without limitations and does not need assistance with meal preparation, housework, or laundry." Id. at 20-21 (citing Pet. Ex. 52 at 157; Pet. Ex. 60 at 3). And Petitioner was able to do her own canning in October 2020. Id. at 21 (citing Pet. Ex. 52 at 54). Thus, in light of the accommodations Respondent has already agreed to, Respondent maintains eight hours of home care per week is reasonable. Id.

8

      **2.**      **Hair Care & Podiatry**

Petitioner requests $1,440.00 per year for life for hair care and podiatry. Resp. Ex. I at 1. Petitioner estimates she would spend $16,905.00 over the course of her life on these items. Pet. Br. at 8-9. Petitioner's life care planner and daughter noted Petitioner's difficulty washing her hair and clipping her nails. Id. at 9; Pet. Reply Br. at 4. Petitioner notes this difficulty is due to the weakness in her left hand, which was caused by her GBS. Pet. Br. at 9.

Respondent maintains hair care and podiatry are not items that "result from the vaccine-related injury for which [] [P]etitioner seeks compensation." Resp. Br. at 21 (quoting § 15(a)(1)(A)(i)). Respondent contends these items are not reasonably necessary, and are "routine/typical expenses, which someone would ordinarily pay for from their income, regardless of vaccine injury." Id. (citing Petronelli v. Sec'y of Health & Hum. Servs., No. 12-285V, 2016 WL 1085455, *3 (Fed. Cl. Spec. Mstr. Feb. 22, 2016)). Respondent also states "Petitioner has not submitted evidence that she is unable to care for her hair, nails, [or] feet." Id. at 21 n.5. For support, Respondent notes Dr. Forsyth noted Petitioner was able to perform activities of daily living without limitation and the life care planner noted Petitioner was independent in self-care. Id. Respondent argues that even if Petitioner is "unable to perform these tasks, her home care provider would be able to assist." Id.

Petitioner disagrees with Respondent's assertion that her home care provider would be able to assist because "[a]n individual engaged to clean and cook[] would unlikely be the same to provide these hygienic services" and this "undercuts" Respondent's argument that 15 hours per week for home care is excessive. Pet. Reply Br. at 4 n.5.

      **3.**      **Home Maintenance**

Petitioner requests $784.40 per year for life for home maintenance. Resp. Ex. I at 1; Pet. Br. at 9-10. In calculating these costs, Petitioner acknowledges that "the value of her personal services in this regard are diminished by the natural progression of her age," and thus, Petitioner agrees to the costs of Spring and Fall cleanup only ($784.40), and not snow removal or lawn care. Pet. Br. at 10. Petitioner also acknowledges that home maintenance is a typical homeowner burden; however, these tasks are typically done by those in the area in which Petitioner lives. Pet. Reply Br. at 5.

Like hair care and podiatry, Respondent maintains this does not "result from the vaccine-related injury for which [] [P]etitioner seeks compensation." Resp. Br. at 21 (quoting § 15(a)(1)(A)(i)). Respondent contends this item is not reasonably necessary, and is a "routine/typical expense[], which someone would ordinarily pay for from their income, regardless of vaccine injury." Id. (citing Petronelli, 2016 WL 1085455, at *3).

9

### 4. Walk-in Bathtub

Respondent agrees a walk-in bathtub is "reasonably necessary," but disagrees as to the amount requested by Petitioner. Resp. Br. at 18. Petitioner requests a one-time cost of $4,250.00,[6] while Respondent agrees to only $3,000.00. Resp. Ex. I at 2.

For support, Petitioner provided evidence of the costs of walk-in bathtubs at Home Depot and obtained quotes on materials for ADA walk-in shower units with installation costs that averaged $3,672.26. Pet. Br. at 10-11. Additionally, the "national average" for a walk-in bathtub is $4,000.00. Pet. Reply Br. at 8. Petitioner also noted the midpoint cost of a walk-in bathtub on Architectural Digest is $4,200.00, and Petitioner agrees with this price. Pet. Br. at 11.

Respondent explains that 64 of the walk-in bathtubs that Petitioner reviewed were between $2,000.00 and $3,000.00 and argues that "Petitioner has not provided evidence that these models do not meet her needs." Resp. Br. at 20. According to Respondent, Petitioner is proposing the midpoint cost of a walk-in bathtub based on Architectural Digest. Id.

### 5. Bathroom Grab Bars

Petitioner is requesting a one-time cost of $200.00 for bathroom grab bars. Resp. Ex. I at 2. Respondent agrees bathroom grab bars are "reasonably necessary," but disagrees as to the amount requested by Petitioner and proposes $0.00. Resp. Br. at 18; Resp. Ex. I at 2.

Respondent argues "a grab bar is usually included with the purchase of a walk-in shower, so [P]etitioner would not require installation of a separate grab bar in the bathroom" if it is included in the walk-in bathtub Petitioner purchases. Resp. Br. at 20. Petitioner disagrees. Pet. Br. at 10. Petitioner notes there are two bathrooms in her home, neither of which has a grab bar. Id. Thus, the $200.00 would include two grab bars and installation. Id. Lastly, Petitioner notes she has not seen a walk-in bathtub or shower with a grab bar. Id.

### 6. Ultrasonic Toothbrush

Petitioner is requesting an annual cost of $49.00 for an ultrasonic toothbrush. Resp. Ex. I at 2. Petitioner contends this item is necessary given the weakness in Petitioner's extremities that "make[s] effective hygiene practice essential." Pet. Br. at 11. In fact, Petitioner's life care planner noted Petitioner has difficulty brushing her teeth. Id. at 9.

Like hair care and podiatry and home maintenance costs, Respondent maintains an ultrasonic toothbrush is not an item that "result[s] from the vaccine-related injury for which [] [P]etitioner seeks compensation." Resp. Br. at 21 (quoting § 15(a)(1)(A)(i)). Respondent contends this item is not reasonably necessary, and is a "routine/typical expense[], which someone would ordinarily pay for from their income, regardless of vaccine injury." Id. (citing

---

[6] The consolidated life care plan noted this cost to be $4,250.00; however, Petitioner's Brief and Reply Brief indicate the cost is $4,200.00 and $4,250.00. Resp. Ex. I at 2; Pet. Br. at 2, 10-11, 40; Pet. Reply Br. at 7-8. Thus, it is unclear if Petitioner is requesting $4,200.00 or $4,250.00.

Petronelli, 2016 WL 1085455, at *3).  Respondent also finds "Petitioner has not submitted evidence that she is unable to care for her . . . teeth."  Id. at 21 n.5.  For support, Respondent cites to Dr. Forsyth's record noting Petitioner was able to perform activities of daily living without limitation.  Id.  And the life care planner noted Petitioner was independent in self-care.  Id.  Thus, Respondent contends that even if Petitioner is "unable to perform these tasks, her home care provider would be able to assist."  Id.

### 7.     Home Modifications

Respondent agrees home modifications are "reasonably necessary," but argues "Petitioner's request for home modifications exceeds that which would be reasonably necessary to live safely in her home."  Resp. Br. at 18-19.  Petitioner requests a one-time payment of $29,900.00 ($12,200.00 for laundry and $17,700.00 for bathroom), while Respondent agrees to pay a one-time cost of only $24,500.00 ($11,000.00 for laundry and $13,500.00 for bathroom).  Resp. Ex. I at 3; Resp. Br. at 19.

First, with regard to laundry modifications, Petitioner requests a total of $12,200.00 and Respondent agrees to only $11,000.00.  Pet. Br. at 12-13; Pet. Reply Br. at 5; Resp. Br. at 10.  The parties' dispute ($1,200.00) concerns Petitioner's request for a stackable washer/dryer.  Pet. Br. at 12-13.  Petitioner asserts a new washer/dryer would be necessary, while Respondent disagrees.  Id. at 12; Resp. Br. at 19.  According to Respondent, "[e]ven if [P]etitioner's washer and dryer were no longer functional, the cost of a washer and dryer would be considered a routine expense, and not compensable under the Vaccine Program."  Resp. Br. at 19.

For the bathroom modifications, Petitioner estimates a cost of $17,700.00 and Respondent estimates a cost of $13,500.00.  Pet. Br. at 12-13; Pet. Reply Br. at 5-6, 5 n.7; Resp. Br. at 19.  Respondent's lowered price is due to the disagreement over whether new tiling is necessary.  Pet. Br. at 12-13; Pet. Reply Br. at 5-7; Resp. Br. at 19.  Petitioner argues re-tiling a bathroom floor is industry practice when completing other bathroom modification such as installing a new walk-in bathtub.  Pet. Reply Br. at 6-7.  Respondent contends Petitioner has not provided evidence showing new bathroom tiling is reasonably necessary.  Resp. Br. at 19.

## IV.   LEGAL FRAMEWORK

Petitioner "bear[s] the burden of proof with respect to each element of compensation requested."  Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); see also § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . .").

### A.    Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Graves, 109 Fed. Cl. at 589-90. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Id. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

### B. Life Care Items

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

(i) result from the vaccine-related injury for which the [P]etitioner seeks compensation,
(ii) have been or will be incurred by or on behalf of the person who suffered such injury, and
(iii) (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or

> (II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs., No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); see also I.D., 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting Scheinfield v. Sec'y of Health & Human Servs., No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); Bedell v. Sec'y of Health & Hum. Servs., No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); Alonzo v. Sec'y of Health & Hum. Servs., No. 18-1157V, 2023 WL 5846682, at *11 (Fed Cl. Spec. Mstr. Aug. 14, 2023).

## V.      ANALYSIS

### A.      Petitioner's Award for Actual Pain and Suffering

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. The undersigned has reviewed the entire record, including the medical records, affidavits, testimony, expert reports and medical evaluations, and all of the evidence that has been filed, and finds an award of $165,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering. In the undersigned's experience, awareness of suffering is not typically a disputed issue in cases involving GBS. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering. See Resp. Br. at 23. Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and she had full awareness of her suffering.

With respect to the severity and duration, Petitioner has suffered from GBS and its residual sequela since December 2013, almost ten years. During this time, she has experienced weakness, neuropathic pain, and fatigue. She made a remarkable recovery, as evidenced by the medical records, but that does not minimize the fact that she has experienced the problems as described in the medical records and reports.

The factors that particularly influence this Ruling are as follows. In June 2022, Dr. Forsyth noted continued weakness, mostly on the left side, and neuropathic discomfort and pain in the hands and feet, which were attributed to Petitioner's GBS. He also opined that her symptoms will likely worsen with aging.

Petitioner also submitted records from her visit to her neurologist, Dr. Debasish Mridha, dated September 29, 2022. Pet. Ex. 63. In the record, Dr. Mridha stated that Petitioner had weakness, worse in her left hand, and numbness in hands and feet as well as balance issues. Id. at 1. Physical examination revealed slightly decreased strength in all four extremities, abnormal gait, significant dysmetria on finger-to-nose testing, and dysmetria on heel-to-shin testing. Id. at 1-2. Sensory examination showed decreased sensation in a glove and stocking pattern, characteristic of GBS. Id. at 2. Of note, Dr. Mridha attributed Petitioner's cognitive decline to her age, and diagnosed age-related cognitive decline. Id. Since cognitive decline is not a usual sequela of GBS, and because Dr. Mridha did not attribute cognitive decline to Petitioner's GBS, and instead attributed it to her age, the undersigned does not find that Petitioner suffers from cognitive decline due to GBS.

Based on all the evidence, and particularly the two most current evaluations from her physician Dr. Forsyth and her neurologist Dr. Mridha, the undersigned finds Petitioner suffers from weakness, numbness, gait abnormality, abnormal sensation, and neuropathy due to her vaccine-related GBS, and that she has suffered these problems since the onset of her GBS in December 2013, almost ten years ago.

The undersigned has considered prior pain and suffering awards in other cases to assist in her determination of an appropriate award. The first of these cases is Gross, 2021 WL 2666685. The Gross petitioner was also admitted to the hospital, underwent diagnostic testing, and received IVIG treatment. Gross, 2021 WL 2666685, at *4. Like Petitioner here, the petitioner in Gross was found to have difficulty walking upstairs at a follow-up appointment following discharge. Id. Ms. Gross did not receive inpatient rehabilitation or outpatient physical therapy, and neither did Petitioner here. Id. Both Ms. Gross and Petitioner suffer from diabetes. Id. However, unlike Petitioner, some of the Gross petitioner's residual effects were attributed to diabetes. Id. at *4-5. In Gross, the duration of suffering, or time from vaccination until the decision awarding damages, was approximately three-and-one-half years. Id. at *1. The Chief Special Master awarded $160,000.00 for pain and suffering in Gross. Id. at *5.

The second case is Taylor v. Secretary of Health & Human Services, No. 18-0100V, 2021 WL 1346059 (Fed. Cl. Spec. Mstr. Mar. 12, 2021). Petitioner in Taylor reported falls before her hospitalization for GBS. Taylor, 2021 WL 1346059, at *3. She had a five-day course of IVIG and then was transferred for inpatient rehabilitation, where she stayed for 35 days. Id. at *3-4. Thus, her entire hospitalization was significantly longer than Petitioner's here, which was 15 days. The petitioner in Taylor required a rolling walker to walk on discharge. Id. at *4. She had significant pain, requiring the use of morphine and Lyrica. Id. She also attended outpatient physical therapy for several months. Id. Approximately eight months after her vaccination, Ms. Taylor reported that she was 90% improved with better balance and normal leg strength. Id.

14

Here, Petitioner did not require devices like a walker. But like the petitioner in <u>Taylor</u>, Petitioner here had significant pain and required the use of dilaudid. The <u>Taylor</u> petitioner also had outpatient physical therapy for several months, but over time, most of her pain resolved except for neuropathic pain in her feet, which required the continued use of Lyrica for about eight months. <u>Taylor</u>, 2021 WL 1346059, at *4. Here, Petitioner did not undergo outpatient physical therapy and she discontinued her Neurontin earlier in time. Although Ms. Taylor had much more extensive therapy, she had a good resolution of acute symptoms. <u>Id.</u> Both Ms. Taylor and Petitioner had balance issues and nerve pain, however, Petitioner had more pronounced issues with weakness and fatigue. The flu vaccine at issue in <u>Taylor</u> was administered on October 25, 2015, and the damages decision issued on March 12, 2021, thus, the duration of her pain and suffering was approximately five-and-one-half years. <u>Id.</u> at *1. The pain and suffering award in <u>Taylor</u> was $160,000.00. <u>Id.</u>

The third case that informs the undersigned's pain and suffering award is <u>Robinson v. Secretary of Health & Human Services</u>, No. 18-88V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020). In <u>Robinson</u>, the petitioner had a more dramatic presentation initially; she spent six days in the hospital, she underwent two lumbar puncture procedures after the first was unsuccessful, she had IVIG for five days, and she required a brief stay in the intensive care unit due the cardiac issues. <u>Robinson</u>, 2020 WL 5820967, at *2. She was also told she might have to be put on a ventilator, which she found to be terrifying. <u>Id.</u> at *4. However, she had a good recovery with relatively mild sequela, including some gait problems, general weakness, and numbness. <u>Id.</u> at *6. Petitioner in <u>Robinson</u> was awarded $160,000.00 in pain and suffering. <u>Id.</u> at *7.

These residual problems are similar to Petitioner's. Additionally, Petitioner has been unable to return to her gardening and yardwork, which were important to her. She is also no longer able to walk and enjoy activities with her grandchildren.

To quote the Chief Special Master, the actual pain and suffering award in GBS cases will be larger than many other vaccine injury cases for the reason "that the severe and frightening quality of an immune-mediated illness like GBS warrants commensurate damages." <u>Gruba v. Sec'y of Health & Hum. Servs.</u>, No. 19-1157V, 2021 WL 1925630, *4 (Fed. Cl. Spec. Mstr. Apr. 13, 2021).

The undersigned has considered the numbers proposed by both parties, however, she does not agree that the amount suggested by either party is appropriate. In reaching a pain and suffering amount of $165,000.00, the undersigned acknowledges that she has awarded larger amounts for pain and suffering in GBS cases. In those cases, however, the facts were different and there were compelling reasons for the larger award. For example, in <u>Johnson</u>, the undersigned awarded $180,000.00 for pain and suffering because that petitioner had residual bowel and bladder incontinence that was quite notable. <u>Johnson</u>, 2018 WL 5024012, at *8. Thankfully, that is not an issue here.

The undersigned also awarded $180,000.00 in <u>Presley</u>, but the facts there were also quite different. In <u>Presley</u>, during his acute GBS episode, the petitioner fell off his bed at home and was not able to move. <u>Presley</u>, 2020 WL 1898856, at *2, *10. He stayed on his floor for eight

15

hours before being found by a neighbor.  Id.  Because of his GBS, he was completely unable to move for a period of time.  Id. at *10.  He had nine unsuccessful attempts at a lumbar puncture.  Id. at *4, *10.  He contracted an infection in his previously amputated leg that required him to use a wheelchair for a protracted period of time before his amputated leg was well enough so that he could wear his prosthesis for walking.  Id. at *11.

Respondent cites cases on the lower end of the spectrum, number wise.  For example, in Castellanos, the petitioner was awarded $125,000.00 for pain and suffering.  Castellanos, 2022 WL 1482497, at *1.  Mr. Castellanos was in an acute hospital setting for nine days, and he received inpatient rehabilitation for 30 days.  Id. at *9.  He required a rolling walker on discharge from the rehabilitation facility.  Id.  He also had diabetes, chronic kidney disease, and CTS.  Id. at *10.  When awarding pain and suffering, the special master stated that it was "difficult to disentangle . . . [the] lingering GBS symptoms from [the] comorbidities," especially diabetes, pre-existing bilateral ankle weakness, and CTS.  Id.  Here, however, Petitioner's neurologist has attributed her numbness, weakness, and fatigue to her GBS, and thus, the undersigned does not have to "disentangle" the cause of those residual effects.

Notably, prior to the vaccination at issue, Petitioner's medical records from her primary care provider, Dr. Forsyth, did not describe any numbness, tingling, or weakness.  See Pet. Ex. 2 at 4-6; Resp. Brief, filed Sept. 29, 2020, at 2 (ECF No. 104).  After vaccination, Petitioner had tingling in her hands and weakness all over.  Pet. Ex. 2 at 18, 33.  Neurologist, Dr. Jahnke interpreted her EMG to be consistent with GBS, and not changes caused by diabetes.  Id. at 79.  Petitioner also had absent deep tendon reflexes, consistent with GBS, not diabetes.  Id. at 78.  Lumbar puncture revealed elevated protein of 128, which was interpreted as positive for GBS, and not as caused by diabetes.  Id. at 83, 103.  At a follow-up appointment, Dr. Jahnke noted that regarding GBS, Petitioner was still having numbness in her feet, sensory loss, that her strength was not back to normal, and that she had fatigue and tired easily.  Id. at 153-54.  Dr. Jahnke attributed these problems to GBS and not diabetes.  Id.

Moving forward to 2022, Petitioner was seen by neurologist Dr. Mridha in June.  Pet. Ex. 58 at 2.  She continued to report weakness and numbness in her feet and hands, left more than right.  Id.  Physical examination revealed decreased coordination in her upper extremities, abnormal gait, and decreased sensation, all consistent with GBS.  Id. at 3.  In September 2022, Dr. Mridha documented that Petitioner had "weakness, numbness, [and] gait abnormality, [and] these could be most likely due to her history of GBS."  Pet. Ex. 63 at 2.  Dr. Mridha also noted that "[Petitioner's] EMG showed neuropathy which is also consistent with history of GBS."  Id.  Petitioner's expert, Dr. Alkaitis, also provided an opinion consistent with Dr. Mridha.  Pet. Ex. 64 at 1-5.  Dr. Alkaitis opined Petitioner suffered from ongoing symptoms of GBS, including tingling of her hands and feet, gait abnormalities, and weakness.  Id. at 4-5.

There are several entries in Petitioner's medical records that reference her diabetes, but on the whole, the weight of the evidence preponderates in favor of a finding that GBS was the cause of her weakness, numbness, abnormal gait, decreased coordination, and fatigue.  Therefore, the undersigned finds these problems are residuals of her GBS, and that they were not

16

caused by diabetes or CTS.[7]

Considering the record as a whole, the undersigned finds that $165,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering. The undersigned recognizes that Petitioner's duration of suffering has been longer than the other cases described. It has been almost 10 years since the onset of her GBS, which is considerably longer than the time frame between vaccination and an award in the other similar cases discussed. However, by comparison to the other cases, Petitioner's course was less severe. She did not require a rolling walker or inpatient or outpatient rehabilitation. Thus, the undersigned finds her course to be more moderate than that experienced by some of the petitioners in the cases described above. The award of $165,000.00 acknowledges that Petitioner has experienced a longer duration of suffering than that experienced by the above-mentioned petitioners, and it recognizes the permanency of her residual effects.

### B.   Life Care Plan

#### 1.   Home Care

Respondent does not dispute that home care is "reasonably necessary." Resp. Br. at 18. The parties dispute here involves the number of hours, 8 versus 15, per week for life that should be awarded.

The undersigned finds that after a review of all the evidence that 12 hours per week for life is reasonably necessary. Neither party fully explained their positions and how they arrived at the hours they deemed reasonably necessary. It is clear from the records that Petitioner does require assistance with hygiene, laundry, cooking, and housework. Additionally, Petitioner's life care planner specifically looked for a "home health aide" that would provide hygienic, laundry, light housework, and cooking services. Pet. Ex. 65 at 3 n.5. The undersigned finds 12 hours per week a reasonable amount of time to assist with these tasks.

#### 2.   Hair Care & Podiatry

Petitioner requested $1,440.00 per year for life for hair care and podiatry, and Respondent argues these items are not "reasonably necessary" and are not items that "result from the vaccine-related injury for which [] [P]etitioner seeks compensation." Resp. Br. at 18, 21.

The undersigned finds this cost to be duplicative as "hygiene" is included in the home care cost discussed above. It is unclear why Petitioner's life care planner chose to exclude hair and nail care from "hygiene." See Pet. Ex. 65 at 3-4, 3.n.3. Petitioner's life care planner

---

[7] Petitioner's CTS was limited to her left hand and was described as mild. See Pet. Ex. 52 at 255; Pet. Ex. 64 at 3, 5. Further, there is no medical record or medical opinion evidence that CTS contributed to Petitioner's complaints of weakness, sensory loss in her feet, abnormal gait, decreased coordination, or fatigue.

estimated "home care" costs for a "home health aide."[8]  Id. at 3 n.5.  Petitioner's life care planner also noted that the agencies that provide home health aides provide hygienic services.  Id.  The undersigned is not persuaded by Petitioner's argument that "[a]n individual engaged to clean and cook[] would unlikely be the same to provide these hygienic services," especially since Petitioner's own life care planner and brief stated the "home care" item comprised of additional services including "hygiene."  Pet. Reply Br. at 4 n.5; Pet. Br. at 5, 7; Pet. Ex. 65 at 3.

Additionally, it would be speculative to award $1,440.00 per year for life for hair care and podiatry.  Petitioner's life care planner stated she "estimated" this cost to be $720.00 each per year, but failed to provide any evidence to support such estimation.  Pet. Ex. 65 at 4 n.7.  Nor did she explain why this separate cost would not fall under the duties of a "home health aide."

Overall, the undersigned finds evidence that Petitioner has difficulty washing her hair and cutting her fingernails and toenails.  However, she does not find this cost here to be "reasonably necessary" because a home health aide has been awarded, and the duties of such home health aide include hygiene.  Therefore, this cost will not be awarded as it is not reasonably necessary.

### 3. Home Maintenance

Petitioner requested $784.40 for Spring and Fall cleanup per year for life, which Respondent contends is a routine cost, and thus, not reasonably necessary.  There is evidence to support a finding that Petitioner is no longer able to complete the yardwork she undertook previously.  See, e.g., Pet. Ex. 65 at 5 n.8.  As such, the undersigned finds this service reasonably necessary, and she will award for the duration of Petitioner's life.

### 4. Walk-In Bathtub

The parties agree that this item is "reasonably necessary," but they dispute the cost that should be awarded for a walk-in bathtub.  Resp. Br. at 18.  Both parties provided various prices of a walk-in bathtub.  The average cost of a walk-in bathtub, according to Petitioner based on estimates from Home Depot, is $3,672.26.  Pet. Br. at 10-11.  The undersigned finds this cost reasonable and will award Petitioner $3,672.26 for a walk-in bathtub.

---

[8] Duties for a home health aide include personal care (e.g., bathing, hair care, dressing, grooming), meal preparation and feeding, housekeeping, laundry, and more.  What Home Health and Personal Care Aides Do, U.S. Bureau Labor Stat., https://www.bls.gov/ooh/healthcare/home-health-aides-and-personal-care-aides.htm#tab-2 (last modified Sept. 6, 2023); Private Duty Home Care Services, Helping Hand Nursing Serv., https://helpinghandhealthcare.com/our-services/private-duty-home-care-services/ (last visited Sept. 19, 2023); First Choice Staffing Agency, Care.com, https://www.care.com/b/l/first-choice-staffing-agency/saginaw-mi (last visited Sept. 19, 2023).

### 5. Bathroom Grab Bars

Respondent does not dispute that this item is "reasonably necessary," but disputes the amount requested by Petitioner ($200.00),[9] contending these bathroom grab bars would be included with the walk-in bathtub. Resp. Br. at 18, 20. As Petitioner's life care planner explained, there are two bathrooms in Petitioner's home and neither bathroom has a grab bar. Pet. Ex. 65 at 8. In this context, the grab bars appear to be related to the bathroom toilets, and not the bathtub. Additionally, the consolidated life care plan discusses grab bars in the context of the toilet riser. See Resp. Ex. I at 2. As such, the undersigned finds these grab bars reasonably necessary and will award Petitioner $200.00 for bathroom grab bars.

### 6. Ultrasonic Toothbrush

The parties disagree as to whether an ultrasonic toothbrush is reasonably necessary. Given Petitioner's weakness in her hands and her difficulty brushing her teeth, the undersigned finds this cost to be reasonably necessary. The undersigned is not persuaded by Respondent's arguments on this point. Thus, Petitioner is awarded $49.00 per year for life for an ultrasonic toothbrush.

### 7. Home Modifications

Respondent agrees home modifications are "reasonably necessary," but argues "Petitioner's request for home modifications exceeds that which would be reasonably necessary to live safely in her home." Resp. Br. at 18-19. For the following reasons, the undersigned awards Petitioner a total of $28,700.00 for home modifications, including $11,000.00 for laundry room modifications and $17,700.00 for bathroom modifications.

First, with regard to the laundry modifications, the undersigned awards $11,000.00. Here, Petitioner requests $12,200.00, $1,200.00 more than what Respondent agrees to because Petitioner asserts a new stackable washer/dryer is necessary. The undersigned finds Petitioner has not provided evidence showing a new stackable washer/dryer is reasonably necessary as she currently has a washer and dryer. The undersigned agrees with Respondent that the cost of a washer and dryer would be a "routine expense." Thus, the undersigned awards only $11,000.00 for laundry modifications.

Next, the undersigned awards $17,700.00 for bathroom modifications. Here, the parties' monetary disagreement concerns the necessity and pricing of new flooring. The undersigned agrees with Petitioner's assessment and finds that it would be reasonably necessary to replace the tiling on a bathroom floor that is being modified with the rest of the agreed-upon bathroom modifications.

---

[9] Although Petitioner's life care planner estimated this cost to be $322.00 per bar, with a total cost of $706.00, Petitioner is only requesting $200.00. Pet. Ex. 65 at 8-9; Pet. Br. at 11.

19

## VI. CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded (1) $165,000.00 for pain and suffering and (2) and an amount sufficient to fund the life care plan items agreed upon by the parties as well as those awarded herein.

The parties are to file a joint status report within 30 days, **by Monday, October 23, 2023**, (1) providing a complete and final life care plan which takes into consideration the items adjudicated herein, and (2) confirming that all items of damages have now been resolved and that no issues remain outstanding.

Thereafter, a damages decision will issue.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

20